

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-17-1994

# United States of America v. Daddona

Precedential or Non-Precedential:

Docket 93-7338

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"United States of America v. Daddona" (1994). *1994 Decisions*. Paper 117.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/117

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 93-7338
No. 93-7683
No. 93-7725
No. 93-7351

_____

UNITED STATES OF AMERICA,

Appellee,

vs.

JOHN L. "JACK" DADDONA,

Appellant in Nos. 93-7338, 93-7683, and 93-7725.

SIDNEY COHEN,
Appellant in No. 93-7351

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(D.C. Criminal Action Nos. CR-92-179-01 and -02)

_____

ARGUED MAY 19, 1994

BEFORE:  BECKER, LEWIS, Circuit Judges,
and IRENAS, District Judge.*

(Filed August 17, 1994)

_____

_____

* Honorable Joseph E. Irenas, United States District Judge
for the District of New Jersey, sitting by designation.

David Barasch
United States Attorney
Kim David Daniel (Argued)
Assistant United States Attorney
Federal Building, 228 Walnut Street
Harrisburg, PA 17108

                Attorneys for Appellee


James G. Wiles, Esquire (Argued)
Law Offices of James G. Wiles
1411 Walnut Street, Suite 200
Philadelphia, PA  19102

James L. Heidecker, Jr., Esquire
Lawyers Professional Building
27 North Street, 4th Floor
Allentown, PA  18101

                Attorneys for Appellant Daddona


Francis Recchuiti, Esquire (Argued)
Vangrossi & Recchuiti
319 Swede Street
Norristown, PA  19401

                Attorneys for Appellant Cohen

_____

OPINION OF THE COURT
_____


IRENAS, District Judge.

     Appellants were convicted of various counts of fraud

stemming from their attempts to disclaim performance and payment

bonds issued in connection with a construction project.  Pursuant

to U.S.S.G. § 2F1.1(b), the trial court determined the amount of

loss for sentencing purposes to be in excess of $1,500,000, most

of which represented the mortgagee's cost to complete the project

after taking it over from the mortgagor/developer. Although the mortgagee was not an obligee under the bonds, the district court nonetheless concluded that its loss was properly attributable to the appellants' fraudulent conduct.

Appellants raise a number of challenges to their convictions and sentences and to the district court's denial of motions for a new trial. We will affirm the judgments of conviction and the district court's denial of appellants' motions for a new trial. However, because we find that the trial court improperly calculated the losses resulting from the appellants' fraudulent conduct, we will vacate the sentences and remand both cases for resentencing.

## I.

### FACTS AND PROCEDURAL HISTORY

Appellant Sidney Cohen ("Cohen") was a principal in Green Hill Associates ("Green Hill"), a limited partnership and the developer of the Green Hill Apartment Building Project ("the project") in Susquehanna Township, Pennsylvania. The project was financed by an $8.9 million mortgage loan to Green Hill from the Summit Tax Exempt Bond Fund, L.P. ("Summit"), which in turn was headed by Stuart J. Boesky ("Boesky").

Construction on the project began in July of 1986. By the spring of 1987, the project was substantially behind schedule. Cohen sought to replace the general contractor, Susquehanna Construction Company ("Susquehanna"), with Eastern Consolidated

Utilities, Inc. ("ECU"), a building contractor owned and operated by appellant John L. ("Jack") Daddona ("Daddona"). Summit agreed to the substitution, provided ECU obtain performance and payment bonds in the amount of $3 million.[1] Summit also threatened foreclosure unless the bonds were produced by July 29, 1987.

Daddona consulted Daniel Culnen ("Culnen") of the Culnen & Hamilton Agency ("C & H"), one of the largest independent surety bond brokers on the East Coast and Daddona's long-time insurance agent. He advised Culnen of Summit's demand, and Culnen agreed to issue the bonds through Employers Insurance of Wausau ("Wausau"), for whom he was a registered independent agent. However, as a condition to his agreement, Culnen required that Daddona, Cohen, and their families agree in writing to personally indemnify Wausau for any claims paid on the bonds.[2]

By letter dated June 15, 1987, Culnen advised Summit that in the event ECU were to become the project's general contractor, it

---

[1] A performance bond guarantees the owner that the general contractor will perform his contract. A payment bond, sometimes referred to as a labor and materials bond, guarantees the that the general contractor's subcontractors and materialmen will be paid for their services. The bonds are usually issued in tandem. It should be noted that while Green Hill, as owner, had rights under both bonds, and the subcontractors and materialmen had rights under the payment bond, Summit was not an obligee under either bond. See p. 24, infra.

[2] The requirement that Cohen execute an indemnity agreement was unusual in that it essentially vitiated any benefits that might have inured to Cohen from the bonds. At trial, Culnen explained his concern that Cohen, who had earlier filed what Culnen considered to be specious claims against the bonds held by Susquehanna, would make similar claims against ECU's bonds. The indemnity agreement was expressly designed to prevent Green Hill from filing claims under the bonds.

would be able to obtain the necessary bonding.  Thereafter, on July 6, 1987, Cohen, Daddona, and their families executed an indemnity agreement.  On July 20, 1987, ECU and Green Hill entered into a $3.4 million contract for the completion of the project.

On July 27, 1987, Culnen directed his bond manager, Pamela Hayes ("Hayes"), to prepare the bonds on Wausau forms.  Hayes prepared the bonds, affixed the Wausau corporate seal, and attached power of attorney forms.  Hayes, purportedly at Culnen's behest, did not follow the usual procedure and give the bonds a new number. Rather, she affixed a number that had been used on a previous ECU project and then twice witnessed Culnen's signature under the fictitious name of "B. Adams."

Culnen signed both bonds and delivered them to Daddona along with a cover letter explaining the method of calculating the bond premium.  Although Culnen did have authority to execute and deliver Wausau bonds, he breached his own agreement with Wausau by failing to report his execution and delivery of the bonds and by failing to obtain Wausau's prior approval.

Daddona signed the bonds on July 29, 1987, and forwarded them to Cohen.  Cohen witnessed Daddona's signatures on the bonds and directed his attorney, Mitchell Leiderman ("Leiderman"), to forward copies of the bonds to Summit, which Leiderman did on July 30, 1994.  Summit halted its foreclosure proceedings, and ECU commenced work on the project in August of 1987.

A.   Padding the Invoice

In August Culnen prepared and mailed to Daddona an invoice for the bond premiums in the amount of $42,413. Shortly thereafter Cohen called Culnen and instructed him to prepare a new invoice in the amount of $52,413, the difference representing an unrelated $10,000 consulting fee owed by Cohen to Culnen. Daddona indicated that he had no objections to the request.

At Daddona's direction, Culnen forwarded the upwardly revised invoice to Cohen, who submitted it to Summit on October 7, 1987, as part of a monthly requisition. When Summit released the funds to Cohen on October 21, 1987, Cohen immediately forwarded the monies to Culnen and received a check back from Culnen for $10,000 on November 27, 1987.

Culnen retained the remaining $42,413 for a period of time, but was pressured by Cohen and Daddona to divide the money. Consequently, Culnen agreed to give Daddona a $32,413 credit against his outstanding account balance, which was memorialized in a credit memo dated May 11, 1988. On May 16, 1988, Culnen forwarded a second check for $10,000 to Cohen.

B. Resuming Construction

Once the new general contractor was in place, Cohen sought to entice the subcontractors, many of whom had left the project for non-payment, to return to work on the project. At several jobsite meetings conducted in August of 1987, Cohen and ECU employees displayed copies of the bonds and assured the subcontractors that the bonds guaranteed their payment. At least two subcontractors, Thomas Strawbridge and Robert Yingling,

subsequently executed contracts with ECU for work on the project. Copies of the bond were also mailed to Les Stewart ("Stewart") of York Excavating Company ("York"), thereby inducing him to return to work.

C.    Disclaiming the Bonds

By the end of 1987, the project was still behind schedule, and Summit was again threatening foreclosure. In or around December of 1987, Cohen and Daddona returned the original bonds to Culnen without informing Summit or the subcontractors.[3] By January of 1988, most of the subcontractors had left the site for non-payment, and on February 5, 1988, Summit commenced foreclosure proceedings.

In a settlement reached on April 8, 1988, Summit agreed to pay Green Hill $216,000 less the amount of any unpaid subcontractor bills then due and owing on the project. In return, Green Hill agreed to deed the project to Boesky's nominee, Green Hill Investors,[4] to assign to Summit Green Hill's rights (but not its obligations) in the contract with ECU, and to

---

[3]    While it may be that Cohen or Daddona thought that by returning the original bonds to the issuer they were limiting the rights of potential claimants, and thereby their indemnity obligations to Wausau, there is no legal basis for concluding that the rights of parties who entered into contracts or performed labor in reliance on the bonds could have their rights unilaterally terminated in this manner. Indeed, the indictment itself was premised, at least in part, on the validity of the bonds. If the bonds were in fact not valid when issued, there could be no fraud in disavowing them.

[4]    For convenience, we will refer to Summit and Green Hill Investors collectively as "Summit."

escrow Cohen's beneficial interest in the bonds to pay off liens that might accrue on the property in the four months following the settlement.[5]

In March, Wausau began to receive claims on the payment bond. On March 16, 1988, the attorney for the International Brotherhood of Electrical Workers Union ("IBEW") filed a claim against the bond with Wausau's home office in Wisconsin and forwarded copies to Cohen and Daddona. On March 21, 1988, Jack Meyers ("Meyers") of Construction Management Corporation ("CMC") also made a claim by sending a copy of the claim letter to Wausau's regional bond manager in Totowa, New Jersey, Ken Gelok ("Gelok"). CMC and York filed formal claims against Wausau on April 14, 1988.

Gelok was surprised by the claims. Company policy required both regional manager and home office approval prior to the issuance of any bonds in excess of $750,000. Gelok knew nothing of the bonds and called Culnen on or about March 25, 1987, to clarify the situation. Culnen advised Gelok that the claims were not valid because he had the cancelled bonds in his possession.

At a meeting in Culnen's office on March 29, 1988, Culnen

---

[5] The four-month escrow period tracked the Pennsylvania statute of limitations for the filing of mechanic's liens. 49 P.S. § 1502. It is clear that Green Hill's assignment was strictly limited to the possible liability to existing unpaid subcontractors who were either known at the closing or who filed claims within four months. The essence of the settlement was that Summit's nominees would take the project free and clear of any existing claims of ECU's subcontractors. In fact, those debts were paid by deductions from the $216,000 owed to Green Hill, and Summit's limited rights under the four-month escrow period were never exercised.

delivered the bonds to Gelok and falsely assured him that the bonds were not valid, that he had never signed them, and that someone else -- perhaps Meyers -- had forged his signature. Culnen repeated this tale in a letter dated April 15, 1988, in which he advised Gelok that the bonds were forgeries and that York's and CMC's claims were "phoney claims filed by crooks who probably stole blank forms and forged [Culnen's] signature."

On April 20, 1988, Gelok again met with Culnen at the latter's office. During the course of the meeting, Gelok advised Culnen that he had been unable to contact Cohen to confirm Culnen's story about the bonds. Culnen then picked up the telephone, dialed some numbers, and handed the phone to Gelok. A man who identified himself as Sidney Cohen informed Gelok that "there was no bond in force, there never was and there never would be." Daddona App. at 325. The man also advised Gelok that the bonds on which Meyers' and Stewart's claims were based were forgeries, and that Meyers may have been the one who forged Culnen's signature.

On April 22, 1988, Culnen wrote a second letter to Gelok, in which he informed Gelok that he had contacted Daddona, then on a hunting trip in Alaska, and "the conclusion we [i.e., Culnen and Daddona] came to is . . . that Meyers signed the bond form, which was blank, in Jack's office pending finalization of negotiations with the owner." Daddona App. at 223-24. Relying on the letters from Culnen and Gelok's conversation with Cohen, Wausau advised Meyers by letter dated April 20, 1988, that no Wausau bonds existed on the Green Hill project. Thereafter, on April 26,

1988, Wausau issued a second letter, denying Stewart's and Meyers' bond claims on the grounds that no valid bonds existed for the project.  On May 6, 1988, Wausau denied the IBEW claim.

On June 16, 1988, Summit, while in the midst of hiring a new general contractor, sent a letter to Wausau inquiring about the status of the bonds.  Culnen advised Wausau by letter dated June 21, 1988, that he had neither executed nor delivered the bonds. Wausau subsequently advised Summit on June 27, 1988, that no bonds existed on the project.  On September 30, 1988, Summit filed a formal claim against the bonds, in which it alleged that ECU's failure to perform had cost it $3 million in damages.  The claim was denied by Wausau in a letter dated October 7, 1988. The letter recited that no valid bonds existed on the project, and that even if there were valid bonds, Summit was not a proper claimant.

### D.    The Unravelling of the Scheme

In July of 1988, Meyers contacted the United States Postal Inspectors, prompting an investigation into the project.  On August 5, 1988, grand jury subpoenas were served on Pamela Hayes and C & H.  On October 13, 1988, Culnen admitted to Wausau that he had indeed executed and delivered the bonds in July of 1987 and that they were not forgeries.  Culnen and C & H were indicted in June of 1991.  In November of 1991, Culnen entered into a plea agreement by which he agreed to plead guilty to two counts of mail fraud and cooperate with the government in its investigation of Cohen and Daddona.

Appellants were indicted in July of 1992 and charged with conspiracy to commit mail fraud and two counts of mail fraud. In addition, Cohen was charged with conspiracy to transport a fraudulently obtained security (the $52,413 check issued by Summit for the inflated bond premium), interstate transportation of a fraudulently obtained security, and interstate transportation of a mail fraud victim. The frauds on which the indictment was based were threefold: (1) a fraud on Wausau in not reporting the issuance of the bonds or the receipt of premiums therefor; (2) a fraud on Summit by inflating the invoice for the bond premium to cover an unrelated indebtedness to C & H; and (3) a fraud on potential bond claimants by first returning the original bonds for attempted cancellation and then claiming that the signatures were forgeries.

A five-day joint trial of the appellants was held from September 14-18, 1992. The jury convicted both men of conspiracy to commit mail fraud and of the two counts of mail fraud. The jury also convicted Cohen of interstate transportation of a fraudulently obtained security, but acquitted him of conspiracy to transport a fraudulently obtained security.[6]

On September 25, 1992, appellant Cohen moved for a new trial and, in the alternative, for a judgment of acquittal. That same day, appellant Daddona filed motions to set aside the verdict and for a new trial. In October, both parties filed motions for a

---

[6] The charge of interstate transportation of a fraud victim was dismissed by the judge during the trial.

new trial based on newly-discovered evidence.  All of these motions were denied by memorandum and order dated January 25, 1993.

Appellant Daddona subsequently filed two additional motions for new trial on the grounds of newly-discovered evidence, which were denied by the district court initially and on reconsideration.  Each of the motions was followed by a motion to this Court to remand the matter back to the district court, which were also denied.

E.    The Sentencing

The presentence reports prepared by the U.S. Probation Office set each appellant's base offense level at 6, applying U.S.S.G. § 2F1.1.[7]  Then, relying on the findings of fact made by the court during the Culnen sentencing, the probation officer calculated the approximate amount of losses to the victims to be $1,562,500.[8]  Pursuant to U.S.S.G. § 2F1.1(b)(1)(j), he

---

[7]  Counts 2 (transportation of a fraudulently obtained security), 3 (conspiracy to commit mail fraud), 4 and 5 (mail fraud) were counted as a single offense pursuant to U.S.S.G. § 3D1.2(d).

[8]  See Presentence Report of John L. Daddona at 14; Presentence Report of Sidney Cohen at 14:
>    The monetary losses caused by the offenses are $1,562,500.  This amount is based on the Court's finding regarding losses in the case of Daniel J. Culnen (Dkt. #1:CR-91-105-001).  In the Court's sentencing memorandum in the Culnen case, filed on July 30, 1992, it was determined that for the purposes of sentencing, approximate losses to victims were as follows:

Summit Bond Tax Exempt Fund, L.P.          $1,500,000

recommended a nine-level increase to the base offense level.  The probation officer also recommended a two-level increase for more than minimal planning under U.S.S.G. § 2F1.1(b)(2)(A).

All sides objected to the offense level calculation.  Cohen contended that the losses claimed were either erroneous, not covered by the bonds, or settled prior to sentencing.  Daddona insisted that he was ignorant of any wrongdoing in the issuance of the bonds, and could not therefore be held accountable for losses incurred.  In the alternative, Daddona argued that Summit's losses could not be included in the calculation, as Summit was not a co-obligee on the bond.  The government, on the other hand, objected to the lack of a two-point enhancement to Cohen's offense level for obstruction of justice.

Loss hearings were held on March 30 and April 2, 1993.  The government proffered the testimony of Norman Tandy, of Norman Tandy & Associates, the company hired by Summit to oversee the completion of the project.[9]  Tandy essentially undertook a "cost of completion" analysis -- examining the Summit invoices for the period after Eastern left the project site to determine how much more Summit spent because of the Eastern default, then

---

| Construction Management Corporation/ | |
|---|---|
| Aljohn, Inc. | 53,000 |
| Yingling Construction Company | 9,500 |
| | $1,562,500 |

[9]  Tandy did not testify in person at the loss hearings. Rather, the government moved to supplement the record by incorporating the testimony Tandy had given at the sentencing hearing for Daniel Culnen, which motion was granted on March 9, 1993.

subtracting the cost of changes to the project specifications and the amount of the original Eastern contract. He concluded that Summit had suffered losses of $1,524,761 as the result of appellants' fraudulent conduct.

Appellant Daddona offered rebuttal testimony from S. Leonard DiDonato of Hill, International, who was qualified as an expert construction analyst. DiDonato independently reviewed Summit's records and Tandy's calculations, indicating places where he believed Summit had overspent or Tandy had overestimated the amount of loss. From these he concluded that Summit could have completed the project for $414,719 less than the Eastern contract price, and hence had suffered no loss.

The trial court resolved the various objections to the presentence report in a memorandum dated April 13, 1993. Most of the discussion focused on the amount of loss that properly could be attributed to the defendants' fraudulent conduct. Recognizing that each of the experts were "less than fully objective," the court set out to determine who was the more reliable. It noted that Tandy's calculations had been adopted at the Culnen sentencing and therefore had some indicia of reliability. The court also contrasted the "carefully and specifically enumerated" deductions of Tandy with the "speculative and repetitive deductions" and "artificial numbers" used by DiDonato.

The Court found Tandy's testimony to be more dependable, and adopted the figure of $1,524,761 as the amount of Summit's loss

and $1,568,830 as the total loss for sentencing purposes.[10]
However, the court declined to impose a two-level increase for
more than minimal planning and denied the government's request
for a two-level enhancement to Cohen's offense level for
obstruction of justice.  The decision left each appellant with an
offense level of 15 and a criminal history category of I,
resulting in a sentencing range of 18 to 24 months.  On
application of the appellants, the court granted a downward
departure and sentenced appellants to nine-month terms of
imprisonment.[11]

## II

### LEGAL ANALYSIS

Both appellants challenge their judgments of conviction and
sentences, and Daddona also appeals the district court's denial
of his second and third motions for new trial.  We have appellate
jurisdiction pursuant to 28 U.S.C. § 1291 over final orders of a
district court and jurisdiction pursuant to 18 U.S.C. § 3742 to
review sentences imposed under the United States Sentencing
Guidelines.

Appellants' challenges to their convictions and to the
district court's denial of Daddona's new trial motions are

---

[10]  The court also found that Wausau had incurred $44,069 in
legal fees as a result of the fraud.  It did not, however,
address the claims of the other subcontractors, concluding that
Summit's loss alone was sufficient to place defendants in the $1–
$2 million range.

[11]  Appellants are out on bail pending appeal.

without merit.[12]  However, their claims regarding the calculation
of their sentences require further analysis.


## A. The Standard of Review

"When reviewing the sentencing decisions of the district
courts, '[w]e exercise plenary review over legal questions about
the meaning of the sentencing guidelines, but apply the
deferential clearly erroneous standard to factual determinations

---

[12]  Daddona's claims included the following: (1) the
evidence was insufficient to support his convictions; (2) the
trial court erred in denying appellant's motion for a new trial
based on an alleged Brady violation without conducting an
evidentiary hearing; (3) the trial court erred in admitting
certain government exhibits and testimony; (4) the trial court
erred in allowing the government to use a summary chart during
its closing arguments; (5) the trial court erred in submitting
the indictment to the jury, in drafting the verdict form, and in
answering a question from the jury; and (6) the trial court
improperly allowed the government to question Daddona about a
"check-swapping" arrangement.
    Cohen's claims included the following: (1) the trial court
erred in denying appellant's motion for new trial based on an
alleged Brady violation without conducting an evidentiary
hearing; (2) the evidence was insufficient to support his
convictions; (3) the trial court erred in permitting the
introduction of an "inaccurate and fabricated 'closing
statement'"; (4) the trial court erred in allowing the government
to use a summary chart during its closing arguments; (5) the
trial court erred in submitting the indictment to the jury, in
drafting the verdict form, and in answering a question from the
jury; (6) the trial court improperly permitted evidence of a
"check-swapping" arrangement; and (7) the trial court erred in
incorporating by reference testimony from the Culnen sentencing
hearing.
    Cohen also challenged the failure of the district court to
depart downward, either based on his acceptance of responsibility
or on his age and infirmity.  However, because on remand the
district court is free to revisit the issue of departures from
the properly calculated sentencing range, we need not consider
these claims here.

underlying their application.'" United States v. Fuentes, 954
F.2d 151, 152-53 (3d Cir.), cert. denied, --- U.S. ----, 112
S.Ct. 2950, 119 L.Ed.2d 573 (1992), quoting United States v.
Inigo, 925 F.2d 641, 658 (3d Cir.1991).

Under the Sentencing Guidelines, the base offense level for
fraud is six, U.S.S.G. § 2F1.1(a), which must be increased
according to the size of the loss attributed to the fraud.
U.S.S.G. § 2F1.1(b).  Because appellants challenge the district
court's interpretation of the "loss" concept in § 2F1.1(b), our
review is plenary.  See Kopp, 951 U.S. at 526; United States v.
Bierley, 922 F.2d 1061, 1064 (3d Cir. 1990).

B.  Calculating the Amount of Loss for Sentencing Purposes

The version of U.S.S.G. § 2F1.1(b) in effect at the time the
offenses were committed set forth the following method of
adjusting the offense level :
    (1)  If the loss exceeded $2,000, increase the offense
    level as follows:
    Loss                                    Increase in Level
    . . .
    (G)   $100,001 - $200,000                     add 6
    (H)   $200,001 - $500,000                     add 7
    (I)   $500,001 - $1,000,000                   add 8
    (J)   $1,000,001 - $2,000,000                 add 9
    . . . .

U.S.S.G. § 2F1.1(b) (Nov. 1987); see generally U.S.S.G. § 2B1.1,
commentary at 2 ("'Loss' means the value of the property taken,
damages, or destroyed.").[13]  The district court found the total

_____

[13]  Although it is proper to use the Guidelines in effect at
the time of sentencing, see U.S.S.G. § 1B1.11(a), application of

loss for sentencing purposes to be $1,568,830. U.S.S.G. § 2F1.1(b). Appellants assert, and we agree, that the losses claimed by Summit were not caused by their fraudulent activity and should not have been included in the U.S.S.G. § 2F1.1 calculation.

### C. Cost to Complete as a Measure of Loss

It should be noted at the outset that we do not question the district court's factual determination that Summit's cost to complete the Green Hill project exceeded $1,500,000. The trial judge heard extensive testimony on that issue and his factual determination finds more than adequate support in the record. What the record does not contain is any indication that this loss was due to the fraud of the appellants rather than the obvious failure of two general contractors, Susquehanna and ECU, to fulfill their contractual obligations in a timely fashion.

Culnen was a registered independent agent of Wausau with actual and apparent authority to execute and deliver surety bonds. While there may have been fraud in the failure to advise Wausau of the issuance, in the inflated invoice, in their redelivery to Culnen, and in the effort to mislead possible obligees concerning their validity, the fact remains that the

---

the version of § 2F1.1 contained in the November 1992 Guidelines Manual would have resulted in the imposition of more severe penalties. The district court and the probation officer therefore properly applied the Guidelines in effect at the time of the offense. See U.S.S.G. § 1B1.11(b).

bonds appear to have been validly issued and enforceable by any proper obligee who relied on their issuance.[14]

Under Pennsylvania law, a principal is liable for the acts of its agent committed in the scope of its employment, even though the principal did not authorize the act. Aiello v. Ed Saxe Real Estate, Inc., 508 Pa. 553, 499 A.2d 282 (1982); see also Pennsylvania Nat'l Mut. Casualty Ins. Co. v. Insurance Comm'r of the Commonwealth of Pennsylvania, 121 Pa.Cmwlth. 618, 551 A.2d 368 (Pa. Commw. Ct. 1988). Thus, to the extent that Summit (or any other claimant) has any rights under the bonds, either initially or pursuant to later agreements, those rights would continue to exist.

Although Summit was the project lender, it was not a named obligee under either the performance or payment bonds as they were initially issued. Green Hill was the obligee on the performance bond, while the payment bond named as obligees only those

> having a direct contract with [ECU] or with a
> subcontractor of [ECU] for labor, material or both,
> used or reasonably required for use in the performance

---

[14]  In a recent decision from the Middle District of Pennsylvania, York Excavating Co., Inc. v. Employers Insurance of Wausau, No. CV-91-1037 (M.D. Pa. Oct. 21, 1993)(Memorandum Opinion of Hon. James F. McClure, Jr., U.S.D.J.), the court denied claims brought by one of the project subcontractors against the Wausau bonds for work done pursuant to written and oral agreements entered into in 1987. However, the decision was not premised on the validity of the bonds, but rather on the validity of York's claims. The court found insufficient evidence of an oral agreement with ECU. Furthermore, the court found that since ECU was not a party to the written contracts by which York agreed to perform work, York could not collect under the Wausau bonds.

> of the Contract, labor and material being construed to include that part of water, gas, power, light, heat, oil gasoline, telephone service or rental of equipment directly applicable to the Contract.

York Excavating, slip. op. at 13.

There is also indication in the record that Summit was aware that it was not an obligee when it agreed to accept ECU as the new general contractor. Daddona App. at 259. Of course, a lender benefits indirectly by the existence of a performance or payment bond in favor of the owner and subcontractors. However, because of the Cohen family indemnity, it is clear that Green Hill, controlled by Cohen, would have been reluctant to exercise its rights under the bonds. However, the indictment in this case does not charge the existence of this indemnity as an act of fraud, nor did Summit insist in April of 1988, when negotiating the foreclosure settlement, that Green Hill exercise its rights under the bonds. The record is clear that Summit feared a protracted foreclosure battle and wanted a quick settlement to take control of the project.

It is equally clear that Green Hill's assignment and escrow of the bonds was limited to guaranteeing that existing debts to subcontractors were paid by Green Hill.[15] There is nothing in the

---

[15] The Escrow Agreement specifically provides in the first paragraph that the bonds shall be held for the benefit of [Summit] until such time as there are no mechanics liens filed against the Project resulting from events that occurred prior to the date hereof . . . provided, however, that in the event no Mechanics Liens have been filed against the Project by August 10, 1988, then this Escrow Agreement shall automatically terminate.

record to suggest that Summit ever had to pay debts to subcontractors that were outstanding at the time it took over the property. When Wausau denied Summit's bond claim on October 7, 1988, there is no indication that Summit thereafter took any legal action against Wausau, notwithstanding the significant amount at issue.

It does not appear from the record before us that Summit was harmed in any way by the issuance of the bonds. Nor can we say that Summit was harmed by the efforts of Cohen, Daddona, and Culnen at various times to deny the existence of the bonds. As previously noted Summit has no direct rights under the bonds as a named obligee, and its rights as assignee of Green Hill in the settlement of April, 1988, were not only sharply limited, but also unnecessary since the condition of the escrow was satisfied.

A recent decision from the Seventh Circuit offers insight into the issue of measuring damages for sentencing purposes in a fraud case. The appellant in United States v. Marlatt, 24 F.3d 1005 (7th Cir. 1994), owned a title company which sold title insurance underwritten by Ticor Title Insurance Company ("Ticor"). Marlatt purchased a resort hotel and converted it into time-shared condominium units. With each unit sold, he issued a title insurance policy underwritten by Ticor. However, while the policies represented clear title to the units, the titles were in fact heavily encumbered. When Ticor discovered this, it spent $476,000 to clear the titles. Later, in response

Cohen App. at 330a.

to the threat of lawsuits from the purchasers of the condominiums, Ticor spent an additional $565,000 to repurchase all of the units sold.

Marlatt pled guilty to one count of mail fraud and one count of making false statements to the Department of Labor. In determining the amount of loss pursuant to U.S.S.G. § 2F1.1(b), the district court included both the money spent clearing the title and the money spent repurchasing the units, presumably concluding that both were elements of the loss caused by the fraud. The Seventh Circuit vacated the sentence, even though it conceded that the expense of repurchasing the units might be considered as having been caused by the appellant's fraud, in the sense of "but for" causation:

> Even if it had been, it was not chargeable to the defendant under section 2F1.1 of the guidelines. Application Note 7(b) distinguishes between loss on the one hand and consequential and incidental damages on the other and makes it clear that with irrelevant exceptions the latter two items are not to be counted in computing the loss for purposes of sentencing under this guideline. The reason for that distinction is no doubt to prevent the sentencing hearing from turning into a tort or contract suit. The distinction is nicely illustrated by this case. The defendant extracted from Ticor by fraud a bunch of insurance policies on which Ticor was required to make good to the tune of $476,000. In the wake of the loss Ticor incurred other expenses, which were consequences, perhaps even foreseeable consequences, of the fraud, but were not the thing actually taken from Ticor. . . .

Id. at 1007-08 (citations omitted).

Other circuits have likewise drawn a distinction between losses that were directly caused by the fraud and "consequential

and incidental damages."  See, e.g., <u>United States v. Newman</u>, 6 F.3d 623, 630 (9th Cir. 1993)("[The measure of loss] does not include consequential losses.  If the Sentencing Commission had intended to include consequential losses, it would have included them in the definition of loss."); <u>United States v. Wilson</u>, 993 F.2d 214, 217 (11th Cir. 1993)("The phrase 'property taken, damaged or destroyed' does not allow for inclusion of incidental or consequential injury, and it is error to rely on evidence of such injury in calculating loss when the value of the property may be ascertained."), <u>citing</u> <u>United States v. Thomas</u>, 973 F.2d 1152, 1159 & n.9 (5th Cir. 1992); <u>cf.</u> <u>United States v. Stanley</u>, 12 F.3d 17, 20-21 (2d Cir. 1993).

While it may be that Summit's excess cost to complete the project is in some sense a consequence, at least in part, of its involvement with Cohen and Daddona, this loss is "not the thing actually taken" from Summit as a result of their fraudulent activities.

We do not mean to suggest that no financial losses were incurred by the fraudulent activities of the appellants.  Wausau has suffered actual harm in the form of legal expenses, and potential harm in the form of possible claims against the bond. Some of the subcontractors and materialmen who were covered by the payment bond may also have suffered losses, although only a few claims have surfaced and one of the largest has been recently rejected by the Middle District of Pennsylvania.

Whatever losses Summit or others may have suffered from appellant's fraud, Summit has not demonstrated any losses which

can fairly be measured by its cost to complete the project, and it was therefore error for the district court to incorporate Tandy's calculations into the U.S.S.G. § 2F1.1 determination of the loss caused by the fraud. The sentences will be vacated, and the matter remanded to the district court for resentencing.